Filed 11/25/24  P. v. Sanchez CA5
Opinion following rehearing

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F077527 |
| Plaintiff and Respondent, | (Super. Ct. No. SF018769A) |
| v. | |
| FRANCISCO SANCHEZ, | **OPINION** |
| Defendant and Appellant. | |

### THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Brian M. McNamara, Judge.

Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Hill, P. J., Peña, J. and Smith, J.

## INTRODUCTION

Appellant Francisco Sanchez was convicted by jury of two counts of committing a lewd and lascivious act with a child under the age of 14 (Pen. Code,[1] § 288, subd. (a).) In addition, the jury found that Sanchez had committed the offense against multiple victims. (§ 667.61, subd. (e)(4).) Sanchez was sentenced to an aggregate term of 50 years to life in state prison.

Sanchez initially raised the following claims on appeal: (1) the trial court erroneously admitted statements and letters of apology written by Sanchez in violation of *Miranda*[2]; (2) trial counsel rendered ineffective assistance of counsel by failing to seek to exclude Sanchez's statements and his letters of apology pursuant to section 1538.5; (3) the trial court's investigation of potential juror misconduct interfered with the jury's deliberative process; and (4) his sentence of 25 years to life on each count for committing a lewd act upon a child under the age of 14 violated his due process rights, because he did not receive sufficient notice that he would be sentenced under the One Strike law pursuant to section 667.61, subdivision (j)(2).

We affirmed Sanchez's conviction on direct appeal. (See *People v. Sanchez* (Mar. 17, 2022, F077527) [nonpub. opn.].) Sanchez filed a petition for review, which was granted. Following our Supreme Court's decision in *In re Vaquera* (2024) 15 Cal.5th 706 (*Vaquera*), the high court transferred this case back to us with directions to vacate our decision and reconsider the cause in light of *Vaquera*. The parties filed supplemental briefs, which we have considered.

In his supplemental brief, Sanchez contends, and the Attorney General concedes, that he is entitled to resentencing. We agree that Sanchez's sentence must be reversed in

---

[1] All further defined statutory citations are to the Penal Code unless otherwise indicated.

[2] *Miranda v. Arizona* (1966) 384 U.S. 436.

2.

light of our Supreme Court's decision in *Vaquera*, which makes clear that the charging instrument here was insufficient to put Sanchez on notice that the prosecutor was seeking imposition of a prison term of 25 years to life under subdivision (j)(2) of section 667.61 on both of the counts upon which Sanchez was convicted.[3]  Sanchez further contends that he must be resentenced on count 2 pursuant to the sentencing triad under subdivision (a) of section 288.  According to Sanchez, the jury failed to find true an aggravating circumstance on this count, specifically, the multiple victim circumstance (see § 667.61, subd. (e)(4)).  We disagree.  Our analysis is fully set forth in Parts I and II of the Discussion section below.

As to the remaining arguments raised by Sanchez in his original appellate brief, we find them to be without merit.  We address those claims in Parts III through V of the Discussion section below.

We will reverse Sanchez's sentence and remand the matter back to the lower court for a full resentencing.  In all other respects, the judgment is affirmed.

### PROCEDURAL HISTORY

On October 31, 2016, the Kern County District Attorney's Office filed an information charging Sanchez with two counts of sexual intercourse or sodomy with a child under the age of 10 (§ 288.7, subd. (a); counts 1 & 3), and two counts of lewd and lascivious acts with a child under the age of 14 (§ 288, subd. (a); counts 2 & 4).  As to

---

[3]  Section 667.61, subdivision (j)(2) provides the following:  "A person who is convicted of an offense specified in subdivision (c) under one of the circumstances specified in subdivision (e), upon a victim who is a child under 14 years of age, shall be punished by imprisonment in the state prison for 25 years to life."

Here, Sanchez was accused (and subsequently convicted) of committing two counts of a lewd and lascivious act with a child under the age of 14 years (§ 288, subd. (a)), an offense specified in subdivision (c) of section 667.61 (see *id*. subd. (c)(8)), against multiple victims, a circumstance specified in subdivision (e) of section 667.61 (see *id*. subd. (e)(4)).  However, the information did not reference subdivision (e) of section 667.61 or the 25 years to life sentence mandated under this subdivision explicitly.

3.

counts 2 and 4, the information further alleged a multiple victim enhancement (§ 667.61, subd. (e)(4).)

On February 26, 2018, Sanchez's jury trial commenced.

On April 5, 2018, the jury returned guilty verdicts on counts 2 and 4 and found true the multiple victim enhancement allegations. The jury deadlocked on counts 1 and 3, and the court declared a mistrial as to those counts.

On May 17, 2018, the trial court sentenced Sanchez to an aggregate term of 50 years to life in state prison. Sanchez received a sentence of 25 years to life on count 2, plus a consecutive term of 25 years to life on count 4.

On June 15, 2022, the California Supreme Court granted a petition for review filed by Sanchez.

On May 15, 2024, the matter was transferred back to this court with directions to vacate our decision in light of *Vaquera, supra*, 15 Cal.5th 706. The parties submitted supplemental briefing to this court.

After issuing our opinion, we granted a petition for rehearing filed by Sanchez to address the remaining claims originally raised in his opening brief, which were omitted from our most recent opinion following remand.

**STATEMENT OF FACTS**

*The Prosecution's Case*

John Doe No. 1 (JD1) and John Doe No. 2 (JD2) were born in 2010 and 2006 respectively. On August 28, 2016, JD1 and JD2 independently told their mother, A.E., that Sanchez, her mother's roommate, had sexually abused them. JD1 specifically said Sanchez had "put his private part in – behind him." A.E. reported the disclosure to police.

On September 12, 2016, A.E. took JD1 and JD2 for forensic medical examinations, performed by forensic nurse Sara Cooper. During the examination, JD2

4.

stated that Sanchez had put "his front privates into my butt" and that "it hurt." He also stated that he was scared of Sanchez.

Because the alleged abuse had occurred approximately two years prior, Cooper did not administer swabs for the perpetrator's DNA. Cooper made no findings as a result of the examinations. However, she explained that the absence of an injury does not mean sexual abuse did not occur. Approximately 95 percent of the forensic examinations conducted yielded negative results.

On October 4, 2016, law enforcement recorded a pretextual telephone call between A.E. and Sanchez. Sanchez repeatedly denied any wrongdoing and maintained his innocence. He also denied giving JD2 money in exchange for JD2's silence. A.E. confronted Sanchez about an occasion where he had allegedly abused one of the children in the bath, and Sanchez instructed him not to tell A.E. Sanchez denied any wrongdoing and told A.E. to have the children "tested."

A.E. also confronted Sanchez about a prior incident wherein he took her outside the City of Lost Hills to ostensibly get a hamburger. A.E. claimed Sanchez made sexual comments to her during the encounter and that he had touched her leg. A.E. was 15 years old at the time.

In response to further questioning, Sanchez claimed that JD1 and JD2 had fabricated the allegations. Sanchez told A.E. that if she had the "evidence in [her] hands [to] go for it." He warned her that she might be "lock[ed] up again" if she pursued the allegations against him.

### The Interrogation

On October 11, 2016, Kern County Sheriff's Senior Deputy Lovan interviewed Sanchez at the Delano police substation. Sergeant Ollague also participated in the interview and acted as a Spanish language interpreter between Lovan and Sanchez. At the beginning of the interrogation, Lovan confirmed that Sanchez had been transported to the police station voluntarily, that he was not placed in handcuffs, and that he was not

under arrest. He also explained the door to the interview room was closed for privacy reasons, but that Sanchez could end the conversation at any time if he needed to.

During the interrogation, Sanchez initially claimed the pretextual phone call placed by A.E. was about how he was taking care of the children while A.E. was in jail. Sanchez explained he was from Chiapas, Mexico, and that he used to be in charge of a church youth group for older kids. He stated that he stays away from A.E. because he is a church person, and A.E. drinks and goes out with men. Sanchez claimed A.E. was intoxicated during the phone call so he eventually hung up on her.

When confronted with further details about the phone call, Sanchez admitted A.E. "was accusing [him] of something serious." Moments later, Lovan announced, "I think we're ready to go ahead and switch gears." He told Sanchez that he and another detective were listening to the phone call, that they knew what Sanchez had said during the call, and that he should start telling the truth. Lovan noticed that Sanchez appeared to be uncomfortable.

Ollague added that because Sanchez was a church guy, he had to start telling the truth. Ollague stated that he and Lovan were going to try to remove the weight from Sanchez's shoulders. He further explained that they had already spoken with the children and that the children had already gone to the doctors. Ollague stated they also knew what Sanchez had done to A.E. when she was younger.

Sanchez initially denied sexually abusing JD2, but admitted the abuse almost immediately thereafter. Sanchez claimed that when JD2 was seven years old, JD2 told Sanchez that another boy had "poked" JD2 from behind. JD2 told Sanchez that he liked being poked by other children. JD2 would follow Sanchez around and ask Sanchez to poke him. Sanchez clarified that JD2 was asking Sanchez to have anal sex with him. Sanchez admitted that he "poked" JD2 on two separate occasions. Sanchez explained JD2 had pulled his own pants down and Sanchez had inserted his penis into JD2's anus. He did not feel his penis go all of the way inside of JD2's anus. JD2 screamed and

6.

Sanchez hugged him. Sanchez said, "Forgive me son, I don't know what I'm doing." JD2 was seven years old at the time of the incident.

The second time occurred when JD2 was nine years old. Sanchez stated that on this occasion, he touched the inside of JD2's buttocks with his penis.

Sanchez admitted that when JD1 was approximately four-and-a-half years old, he did the same thing to JD1. JD1 was playing in the water tubs where they washed vegetables. Sanchez removed JD1 from the tub, pulled down JD1's shorts, and inserted his penis into JD1's anus.

At the conclusion of the interrogation, Lovan asked Sanchez whether he had asked God for forgiveness for what he had done to the children. They gave Sanchez a notepad to write apology letters to JD1 and JD2. The letters mentioned "abuse" but did not specify how JD1 and JD2 had been abused. Sanchez was arrested at the end of the interrogation.

### JD1's Testimony

JD1 identified Sanchez as the defendant. JD1 stated that Sanchez had touched him in a bad way. JD1 did not recognize himself in a video wherein he was being interviewed by the forensic interviewer. However, he remembered telling the interviewer that Sanchez had "put his thing on top or inside of [his] butt."

### JD2's Testimony

JD2 was 11 years old at the time of Sanchez's trial. He lived at his grandmother's house for a period of time, where Sanchez lived as well. JD2 identified Sanchez as the defendant at trial.

JD2 testified that Sanchez had touched him with his front private part and his fingers. He explained that Sanchez had used "his front private part" to touch JD2's back part and that Sanchez's front private part went inside. This occurred approximately three times and it hurt JD2. Sanchez told JD2 not to tell anyone and he gave him money.

7.

*Defense's Case*

Sanchez waived his Fifth Amendment privilege against self-incrimination and testified at trial. He stated that he is from Chiapas, Mexico, a rural area, that he does not have much of an education, and he has never been convicted of any crimes. Sanchez claimed that he did not understand the Spanish that was spoken to him by the Spanish-speaking deputy. He further claimed he did not mean to confess to child molestation and denied ever molesting anyone. Sanchez stated JD1 and JD2 had lied to the forensic interviewer and during their testimony at trial.

## DISCUSSION

**I.      *Vaquera* Compels Reversal of Sanchez's Sentence**

Sanchez contends that his sentence of 25 years to life imposed on both count 2 and count 4 are unauthorized because the information failed to provide him with adequate notice that the prosecutor would seek the enhanced sentence of 25 years to life on both counts. The Attorney General concedes that Sanchez is entitled to resentencing relief. We agree and conclude that under *Vaquera*, the charging instrument here was insufficient to provide Sanchez with adequate notice of the fact that the prosecutor would seek the enhanced penalty of 25 years to life under subdivision (j)(2) of section 667.61.

### A.  The One Strike Law/Vaquera

The One Strike law establishes escalating indeterminate terms depending on the type and number of circumstances present, as identified and enumerated in section 667.61, subdivisions (d) and (e). The One Strike law's sentencing structure not only punishes enumerated sex crimes committed under specific circumstances more harshly, those harsher punishments increase further depending on, for example, the age of the victim or whether there were multiple victims.

To be subjected to any of the penalties under the One Strike law, due process requires a defendant receive sufficient notice. "[I]n addition to the statutory requirements that enhancement provisions be pleaded and proven, a defendant has a cognizable due

8.

process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*People v. Mancebo* (2002) 27 Cal.4th 735, 747.) "This goes for sentence enhancements as well as substantive offenses: A defendant has the 'right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes.' " (*People v. Anderson* (2020) 9 Cal.5th 946, 953.) "To satisfy due process, it is sufficient for an accusatory pleading to provide the defendant fair notice of the particular One Strike sentence the prosecution is seeking and of which facts it intends to prove to support that sentence." (*Vaquera, supra*, 15 Cal.5th at p. 720, citing *Mancebo,* at pp. 753-754.)

Here, the information's One Strike allegations identified counts 2 and 4 (for lewd or lascivious acts against a child under the age of 14 years (§ 288, subd. (a)) as qualifying offenses under subdivision (c) of section 667.61. The information further alleged the multiple-victim circumstance under subdivision (e)(4) of section 667.61. This triggered application of the One Strike law. However, these allegations did not reference subdivision (j)(2) of section 667.61 specifically, nor did they make clear that the prosecutor was seeking a prison sentence of 25 years to life.

In *Vaquera*, our Supreme Court held that the prosecution's failure to provide sufficient notice of the specific One Strike sentence the prosecution is seeking and of the facts it intends to prove to support that sentence constitutes a due process fair notice violation. (*Vaquera, supra*, 15 Cal.5th at pp. 724-725.) There, the information's One Strike allegations referred to subdivisions (b) and (e)(4) of section 667.61, which "suggest[ed] the prosecution was seeking a sentence of 15 years to life based on the multiple victim circumstance." (*Vaquera,* at p. 721.)

However, given the underlying charges (§ 288, subd. (a)), which involved a victim under the age of 14 years, our Supreme Court explained the prosecution had a choice of "(1) not including a One Strike allegation in the information and seeking a determinate sentence of three, six, or eight years (§ 288, subd. (a)); (2) seeking 15 years to life based

9.

on the multiple victim circumstance alone (§ 667.61, subds. (b) & (e)(4)); or (3) seeking 25 years to life based on the additional circumstance that the victim of count 2 was under the age of 14 (*id*., subd. (j)(2))." (*Vaquera, supra*, 15 Cal.5th at p. 721.) The information was tailored in a manner that had suggested the prosecutor was aware of section 667.61, subdivision (j)(2)—a section added by Chelsea's Law—but, by omitting One Strike allegations related to section 667.61, subdivision (j)(2), had elected to seek sentencing under section 667.61, subdivision (b) instead. In context, "the pleading failed to inform [the defendant] of the prosecutor's election to seek the more stringent sentence and did not provide fair notice of his sentencing exposure." (*Vaquera,* at p. 723, fn. omitted.)

The information here suffers the same deficiencies as the charging instrument in *Vaquera*. The One Strike allegations referenced only the aggravating circumstance under section 661.67, subdivision (e)(4), i.e., the multiple victim circumstance. The allegations "did not specify that the prosecution was seeking 25 years to life on [any] count, cite to subdivision (j)(2)," nor did it "otherwise make clear that the prosecution was seeking a longer sentence based on the victim[s'] age[s]." (*Vaquera, supra*, 15 Cal.5th at p. 725.)

Because the One Strike allegation did not adequately inform Sanchez of the prosecutor's intent to invoke the One Strike law circumstance under which the trial court had sentenced him (see § 667.61, subd. (j)(2)), the allegation failed to provide him with fair notice. We must therefore reverse Sanchez's sentence.

Sanchez contends that the matter should be remanded back to the lower court for a full resentencing because the trial court retains the discretion to impose concurrent rather than consecutive sentences. The Attorney General submits that Sanchez must be resentenced to two consecutive terms of 15 years to life. We conclude that a full resentencing is required, at which, the superior court may impose the mandatory terms on counts 2 and 4 of 15 years to life, consecutively or concurrently.

Subdivision (i) of section 667.61 provides: "For any offense specified in paragraphs (1) to (7), inclusive, of subdivision (c), or in paragraphs (1) to (6), inclusive,

10.

of subdivision (n), the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6." Although Sanchez's crimes involved separate victims, his convictions for lewd and lascivious acts (§ 288, subd. (a)) do not implicate section 667.61's mandatory sentencing provisions. By implication, this "leaves the decision to impose consecutive or concurrent terms to the sentencing court's discretion." (*People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524.)

"[W]hen part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893; see *People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"].) We will therefore reverse Sanchez's sentence and remand this matter back to the lower court for a full resentencing.

## II.     The Multiple Victim Enhancement Alleged as to Count 2

Sanchez further contends that the trial court must sentence him under the triad applicable for committing a lewd and lascivious act (see § 288, subd. (a)) on count 2 because the jury did not return a true finding as to the multiple victim allegation, which would otherwise mandate a prison term of 15 years to life (see § 667.61, subd. (b)). According to Sanchez, the jury erroneously found true the multiple victim allegation as to count 3 rather than count 2. Although the verdict form does contain a typographical error, we agree with the Attorney General's assertion that the error is harmless when considered in the full context of the record.

*Background*

Counts 1 and 3 charged Sanchez with the sodomy of John Does 1 and 2, who were 10 years old or younger (§ 288.7, subd. (a)). Neither count alleged a One Strike aggravating circumstance.

Counts 2 and 4 charged Sanchez with lewd and lascivious acts against John Does 1 and 2, both of whom were under the age of 14 (§ 288, subd. (a)). Both count 2 and 4 alleged a multiple victim allegation under the One Strike law (§ 667.61, subds. (c)(8), (e)(4)).

Consistent with the information, the trial court instructed the jury at the conclusion of Sanchez's trial, that if it found Sanchez guilty on counts 2 and 4, it would also need to decide whether the prosecutor had proven, beyond a reasonable doubt, that the crime was committed against more than one victim. And during the parties' comments in closing argument, the prosecutor confirmed that the multiple victim circumstance was alleged as to counts 2 and 4.

During deliberations, the jury foreperson submitted a question to the court, requesting clarification of whether the multiple victim allegation applied to count 2 or count 3. The court responded that it applied to count 2. Less than 10 minutes later, the jury informed the court that it had reached a verdict.

Based upon this evidence, it is abundantly clear that the jury recognized that the verdict form contained a typographical error, that it had intended to find Sanchez guilty on counts 2 and 4, and that it found true the multiple victim circumstance with respect to these counts. We are confident, beyond a reasonable doubt, that the typographical error on the verdict form was not prejudicial under the circumstances. " '[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice.' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We reject Sanchez's assertion to the contrary.

### III. Admission of Sanchez's Confession and Apology Letters

Sanchez contends his confession and letters of apology he wrote to the victims were obtained in violation of *Miranda*.  We conclude Sanchez's statements were not made and his apology letters were not written while "in custody" at the police station, and therefore, a *Miranda* admonition was not required.  Sanchez further contends this evidence was obtained in violation of his Fifth and Fourteenth Amendment rights.  We conclude his challenge on this basis has been forfeited.

#### A. Sanchez's Fifth and Fourteenth Amendment Claims

Sanchez contends his statements and letters were obtained in violation of *Miranda*, as well as the Fifth and Fourteenth Amendments.  The argument in his opening brief however focuses solely on whether his statements were obtained in violation of *Miranda*.  Further, as the People observe, Sanchez never argued below that his statements were obtained in violation of his right to due process under the Fourteenth Amendment.

Notwithstanding the fact that Sanchez failed to raise these arguments below, he offers no legal argument or analysis supporting his assertion that his statements were involuntary in violation of the Fifth or Fourteenth Amendments.  We therefore deem Sanchez's claims on these grounds to be forfeited.  (See *People ex rel. Reisig v. Acuna* (2017) 9 Cal.App.5th 1, 25; *In re S.C.* (2006) 138 Cal.App.4th 396, 408; Cal. Rules of Court, rule 8.204(a)(1)(B) [each point must be supported "by argument and, if possible, by citation of authority"].)  Consequently, we do not address them.

#### B. Background:  Sanchez's *Miranda* Violation Claim and the Trial Court's Ruling

In a motion in limine, the prosecutor moved to admit statements made by Sanchez to Lovan and Ollague.  In response, trial counsel argued Sanchez's statements and apology letters were inadmissible, claiming they were taken in violation of *Miranda*.

At an Evidence Code section 402 hearing, the prosecutor provided trial counsel and the court with transcripts of Sanchez's interrogation and a copy of the visual

13.

recording. The parties stipulated the court could review both and that the testimony of the detectives who conducted the interrogation would supplement the transcript.

The prosecutor called Ollague and Lovan to testify. Ollague had participated in Sanchez's interrogation and had acted as a Spanish language interpreter for Lovan. He has translated for the Kern County Sheriff's Department for the past 22 years.

On October 11, 2016, at approximately 8:30 a.m., Ollague found Sanchez at a Valero Market in Lost Hills, sitting in his truck. After confirming Sanchez's identity, Ollague conducted a patdown of Sanchez for safety purposes. Ollague told Sanchez that he was not under arrest, but that a detective wanted to speak to Sanchez about an incident. Ollague asked Sanchez if he would be willing to go to Sanchez's residence. Sanchez did not object.

Sanchez could not drive his own vehicle because he did not have a driver's license, so he provided Ollague with his keys so that his vehicle could be moved to the parking area of the gas station. A deputy placed Sanchez in the back seat of a patrol vehicle, unhandcuffed.

Lovan first encountered Sanchez outside of Sanchez's residence. Deputy Maldonado acted as a translator for Lovan during their interaction. Sanchez gave Lovan consent to search his room. Sanchez remained unhandcuffed and he moved freely throughout the home.

During the search, Lovan and Ollague told Sanchez that he was not under arrest and asked if he would go to the sheriff's Delano substation for an interview. Sanchez agreed. Ollague described Sanchez as being "very cooperative."

Sanchez was placed into the back of Lovan's patrol vehicle and transported to the substation. The doors in the patrol vehicle lock automatically. However, during the car ride, Sanchez never attempted to open the door of the patrol vehicle.

The interview room had one doorway, which was closed during the interview, but the door remained unlocked. Lovan and Ollague explained to Sanchez that the door was unlocked but that it had been closed for privacy.[4]

Ollague translated throughout the interview, which commenced at 11:26 a.m. and lasted approximately two hours and seven minutes. Lovan told Sanchez he was not under arrest and that he could end the interview at any time. Sanchez was not handcuffed, the deputies never drew their guns, and no force was used during the interview. Sanchez never asked to terminate the interview.

Sanchez did not ask to leave the interview room until the end of the interview, when he asked to use the bathroom. According to Lovan, another deputy escorted Sanchez to the bathroom because the interview had concluded and there was, at that point, sufficient probable cause to arrest him. On cross-examination, both deputies agreed they would very likely have followed or chased after Sanchez if he had run away during their encounters.

Trial counsel argued that Sanchez's statements and letters of apology he had written the victims should be held inadmissible because the deputies did not advise Sanchez of his *Miranda* rights, and the statements were made while Sanchez was in custody. Following argument by the parties, the trial court denied trial counsel's motion.

The court held that the deputies did not lock Sanchez in the back of the patrol vehicle intentionally. Rather, the doors locked automatically. The court found irrelevant the deputies' testimony stating they would likely have chased Sanchez if he had fled because Sanchez never attempted to terminate his interview or flee.

In ruling Sanchez's statements admissible, the trial court concluded that *Miranda* warnings were not required because a reasonable person in Sanchez's position would not

---

**4**      The transcript from the interrogation does not show that Lovan and Ollague told Sanchez the door was unlocked.

15.

have understood his situation as being in custody. During the interview, deputies told Sanchez that he was free to leave the police station at any time. And, although Sanchez knew he was free to leave, he did not try to do so. Further, while Sanchez had to be escorted to the bathroom, this occurred at the end of the interrogation, when deputies determined they had probable cause to arrest Sanchez.

## C. Relevant Legal Principles

"Under California law, issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374.)

In *Miranda v. Arizona, supra,* 384 U.S. 436, the United States Supreme Court held that to protect the federal constitutional right against self-incrimination, "any person who is suspected or accused of a crime and who has been taken into custody or otherwise restrained may not be interrogated by the police unless he [or she] first knowingly and intelligently waives his [or her] right to silence, to the presence of an attorney, and to appointed counsel if indigent." (*People v. Ray* (1996) 13 Cal.4th 313, 336.)

"It is settled that the *Miranda* advisements are required only when a person is subjected to 'custodial interrogation.'" (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1161 (*Aguilera*).) There is no dispute that Sanchez's interview was an interrogation. (*Rhode Island v. Innis* (1980) 446 U.S. 291, 301 [" 'interrogation' " is the express questioning or other words and actions on the part of law enforcement that law enforcement "should know are reasonably likely to elicit an incriminating response from the suspect"].) We therefore turn to whether, considering all circumstances, the interrogation here was "custodial" under *Miranda*.

"The test for custody does not depend on the subjective view of the interrogating officer or the person being questioned." (*People v. Mosley* (1999) 73 Cal.App.4th 1081, 1088.) Rather, "[c]ustody determinations are resolved by an objective standard: Would a reasonable person interpret the restraints used by the police as tantamount to a formal

16.

arrest?  [Citations.]  The totality of the circumstances surrounding an incident must be considered as a whole."  (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403-1404, fn. omitted.)

Courts have identified a variety of factors to consider in making that determination, including:  (1) "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview;" (2) "whether the express purpose of the interview was to question the person as a witness or a suspect;" (3) "where the interview took place;" (4) "whether police informed the person that he or she was under arrest or in custody;" (5) "whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom;" (6) "whether there were restrictions on the person's freedom of movement during the interview;" (7) "how long the interrogation lasted;" (8) "how many police officers participated;" (9) "whether [the police officers] dominated and controlled the course of the interrogation;" (10) "whether they manifested a belief that the person was culpable and they had evidence to prove it;" (11) "whether the police were aggressive, confrontational, and/or accusatory;" (12) "whether the police used interrogation techniques to pressure the suspect;" and (13) "whether the person was arrested at the end of the interrogation."  (*Aguilera, supra*, 51 Cal.App.4th at p. 1162.)  No one factor is dispositive.  (*Ibid*.)

"Custody" is a mixed question of law and fact.  (*Thompson v. Keohane* (1995) 516 U.S. 99, 112-113.)  "On appeal, [a reviewing court will] defer to the trial court's findings supported by substantial evidence and independently determine from the factual findings whether [the] appellant was in custody for *Miranda* purposes."  (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970.)  The reviewing court's analysis is based solely on those facts that were adduced at the suppression hearing.  (*People v. Hartsch* (2010) 49

17.

Cal.4th 472, 491; *People v. Benites* (1992) 9 Cal.App.4th 309, 312; *People v. McKim* (1989) 214 Cal.App.3d 766, 768, fn. 1.)

D. **Relevant Case Law Applying the Aguilera Factors**

In *People v. Saldana* (2018) 19 Cal.App.5th 432 (*Saldana*), the defendant voluntarily walked to the police station by himself for questioning. (*Id*. at pp. 455-456.) He was accused of molesting three young girls who lived in a trailer park where he resided. (*Id*. at p. 436.) The veracity of the victim's claims were "open to question." (*Ibid*.)

At the time of the interrogation, the victims had already been interviewed several times, including by a professional forensic interviewer. (*Saldana*, *supra*, 19 Cal.App.5th at p. 456.) As a result, it was clear that the sole purpose of police questioning was to obtain a confession from the defendant. (*Ibid*.) Although detectives could have spoken with the defendant at his home, questioning occurred in the interrogation room of the police station behind a closed door. (*Ibid*.)

At the beginning of the interview, the detective told the defendant he was not under arrest and that he was free to leave. (*Saldana, supra*, 19 Cal.App.5th at p. 457.) However, the circumstances of the interview indicated otherwise.

During the interrogation—which lasted less than one hour—the detective peppered the defendant with "an unrelenting number of accusatory questions." (*Saldana, supra*, 19 Cal.App.5th at pp. 457, 459.) The defendant denied the allegations more than 25 times, but the detective repeatedly rejected the defendant's denials. (*Id.* at pp. 437, 457.) The appellate court held that the nature of the interrogation strongly supported the conclusion that the interrogation was custodial. (*Id*. at p. 459.) The court described the detective's conduct as "persistent, confrontational, and accusatory." (*Ibid*.) Rather than confront the defendant with the evidence, the detective repeatedly asserted the defendant was guilty and used interrogation techniques that reflected "the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." (*Id*. at p. 460.)

The appellate court further observed the detective had used classic interrogation techniques which had conveyed two things. (*Saldana, supra*, 19 Cal.App.5th at p. 437.) First, "the interrogator's rock-solid belief the suspect is guilty and all denials will fail." (*Ibid*.) This technique includes suggesting the suspect "should confess because no other course of action is plausible, such as confronting him with real or invented evidence, identifying contradictions in his account, and refusing to credit his denials." (*Id*. at p. 460.) And second, suggesting the suspect would "in some way feel better or benefit if he confesses, such as appealing to less morally culpable reasons for committing the offense." (*Ibid*.)

At trial, the jury watched a recording of the defendant's interrogation and during deliberations, they asked to watch it again. The defendant was found guilty of four of the charged counts just two hours later. (*Saldana, supra*, 19 Cal.App.5th at p. 453.) The jury hung on one count involving a third victim who was not mentioned in the defendant's confession, but who testified at trial. (*Id*. at pp. 448, 453.) The *Miranda* violation was held prejudicial. (*Saldana,* at p. 463.)

In *People v. Torres* (2018) 25 Cal.App.5th 162 (*Torres*), the defendant voluntarily agreed to be interviewed after detectives had initiated contact with the defendant at his home. (*Id*. at p. 173.) The defendant believed the detectives had contacted him because he had urinated in the front yard. (*Id*. at p. 167.) After obtaining a saliva sample from the defendant, the detectives told him that DNA could be used to determine if a suspect had touched another person, and that the defendant's DNA results would be available within a few minutes. (*Ibid*.)

The detectives also told the defendant that a doctor had examined the victim's vagina, that they had found DNA results belonging to an adult male, and they were testing the defendant's DNA against those results. (*Torres*, *supra*, 25 Cal.App.5th at p. 168.) The detectives encouraged the defendant "to have the courage to admit his mistake," "that they already knew what happened and could prove it scientifically," that

19.

his "conduct was 'minimal,' " and claimed that "he would feel good by telling the truth." (*Id*. at pp. 168-169.)  At one point, one of the detectives told the defendant, "as soon as you tell us the truth, we go, (unintelligible) to your house."  (*Id*. at p. 179.)

The defendant made incriminating statements that were used against him at trial. (*Torres, supra*, 25 Cal.App.5th at pp. 167-170.)  He was arrested two weeks later.  (*Id*. at p. 170.)  During the 45-minute interview, detectives used a conversational tone and never threatened the defendant or raised their voices.  (*Id*. at pp. 173-174.)

The appellate court found the following factors supported the conclusion that the interview was custodial:  the detectives had initiated contact with the defendant as a suspect, not as a witness to a crime; the defendant was interviewed in a location controlled by the detectives; and the detectives had dominated and controlled the interrogation using techniques designed to pressure the defendant.  These techniques included:  (1) falsely telling the defendant there was evidence against him that could prove his guilt; (2) asking accusatory and confrontational leading questions; (3) giving the defendant false choices and encouraging him to select one of those choices; and (4) minimizing the nature of the accusations.  (*Torres*, *supra*, 25 Cal.App.5th at pp. 176-180.)

Based on the totality of the circumstances, the *Torres* court concluded that the defendant should have been *Mirandized*.  (*Torres*, *supra*, 25 Cal.App.5th at p. 166.)  The appellate court explained the defendant "should have received *Miranda* warnings when the detectives essentially told [him] that they would not leave, and he could not go home, until [he] told them the truth based on the evidence they had against him."  (*Ibid*.)  To this end, the detectives had gone further than the detective in *Saldana*.  (*Id*. at p. 179.)

The court further found the admission of the defendant's statements prejudicial because there were no third-party witnesses or physical evidence corroborating the victim's claims; the victim could not identify the defendant at trial; the victim's testimony was equivocal; and as a result, the defendant's statements likely resolved any doubts the jurors had about the victim's credibility.  (*Torres*, *supra*, 25 Cal.App.5th at pp. 181-182.)

Finally, in *People v. Potter* (2021) 66 Cal.App.5th 528 (*Potter*), detectives contacted the defendant about allegations that he had sexually abused his own daughter. (*Id*. at p. 532.) The defendant agreed to come to the police station to take a polygraph examination. (*Id*. at p. 533.) Two weeks later, he came into the police station and was placed into an interview room for a pre-polygraph interview. (*Ibid*.) The defendant was advised that the interview was completely voluntary, that he did not have to speak to detectives, and he could stop the interview at any time. (*Ibid*.)

During the interview, the detective stated multiple times that he believed the victim. (*Potter*, *supra*, 66 Cal.App.5th at p. 534.) The defendant subsequently confessed to having engaged in sexual acts with the victim on multiple occasions. (*Id*. at pp. 535-537.) The defendant participated in two additional interviews with a second detective. (*Id*. at p. 538.) During which, he wrote the victim a letter of apology and read the letter aloud. (*Ibid*.) The defendant was arrested three days later. (*Id*. at p. 539.)

On appeal, the court concluded the defendant was not in custody for purposes of *Miranda* during the interviews. (*Potter*, *supra*, 66 Cal.App.5th at pp. 544.) The questioning, which lasted less than two hours, was "more like a 'therapy session' than a typical interrogation." (*Id*. at p. 542.) Thus, among other factors relevant to the court's determination, the appellate court observed, "the tone and tenor of the questioning would not have caused a reasonable person in defendant's position to have believed he was not free to terminate the interviews and leave the police station." (*Ibid*.)

**E. Analysis**

Applying the *Aguilera* factors to the instant case, we find that based upon the totality of the circumstances, a reasonable person in Sanchez's position would not have believed that he could not terminate the interrogation and leave the police station. Our analysis is fully detailed below.

We emphasize that our conclusion should not be interpreted as a tacit endorsement of the deputies' actions in the instant case. In our view, the instant case is extremely

21.

close, and under the circumstances, we have no doubt that the admission of Sanchez's statements and apology letters would have been prejudicial under the heightened standard of review articulated in *Chapman v. California* (1967) 386 U.S. 18, 24 ["before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"].)

Although the People argue there is strong evidence supporting Sanchez's guilt notwithstanding his confession, "[t]he inquiry[] … is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Although Sanchez was found not guilty of sodomy on counts 1 and 3, we have no doubt that his confession contributed to the jury's verdict for lewd and lascivious conduct alleged in counts 2 and 4. Confessions are " 'a kind of evidentiary bombshell which shatters the defense' " (*People v. Cahill* (1993) 5 Cal.4th 478, 503.) Under the circumstances, the most prudent course of conduct would be to simply provide a suspect with a *Miranda* admonition before commencing an interrogation.

### 1. Factors Weighing in Favor of Custodial Finding

We begin our analysis with the factors which support a finding that the interrogation was custodial. First, at the time of Sanchez's interrogation, he was already suspected of sexually abusing JD1 and JD2. The victims had reported the abuse to their mother, they had participated in forensic examinations and interviews, and A.E. had placed a pretextual phone call to Sanchez to confront him with the accusations. The purpose of the interrogation was clearly to question Sanchez as a suspect rather than as a potential witness, and the deputies had initiated contact with Sanchez for this purpose. (*Aguilera, supra*, 51 Cal.App.4th at p. 1162.)

Second, although detectives could have questioned Sanchez at his home, they conducted the interrogation at a police substation, and they drove Sanchez to the

substation. The fact that the suspect of a crime is interrogated at a police station does not, by itself, transform every interview into a custodial interrogation. (See, e.g., *Oregon v. Mathiason* (1977) 429 U.S. 492, 495 [*Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect"]; accord, *People v. Moore* (2011) 51 Cal.4th 386, 402.) However, a police station is a highly confrontational environment, which is controlled by law enforcement. (*Saldana*, *supra*, 19 Cal.App.5th at p. 456.)

Third, Lovan stated detectives had already spoken with JD1 and JD2, that the kids had been interviewed by professionals, that they had already had doctor's appointments, and that the deputies knew the truth. Lovan's initial statements were not necessarily a confrontation of false evidence against Sanchez, because the children had participated in forensic interviews and medical examinations. However, Lovan's assertion that they "knew the truth" suggests there may have been forensic evidence to corroborate the children's claims or that the veracity of their claims was a forgone conclusion. Consequently, any attempt by Sanchez to deny the accusations would be futile.

Further, Lovan and Ollague discussed Sanchez's faith in God during the interview and asked him whether he had asked God for forgiveness for what he had done to the children. The deputies also gave Sanchez a notepad to write apology letters to the children. Although this occurred after Sanchez had already confessed to sexually abusing JD1 and JD2, this technique—which stands in contrast to the use of open-ended questions—was clearly employed to elicit further incriminating responses from Sanchez. We therefore conclude the interrogation techniques used by Lovan and Ollague weighs in favor of a custodial finding.

Fourth, there were two deputies in the interrogation. This was initially out of necessity as Ollague was acting as an interpreter for Lovan and Sanchez. During the first portion of the interrogation, the questions posed to Sanchez primarily originated from Lovan, who led the interview, reinforcing Ollague's role as an interpreter. However,

23.

throughout the remainder of the interrogation, Ollague also posed questions of his own to Sanchez, stepping into the role of an interrogator. Thus, the number of police present at the interrogation supports a custodial finding. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

Finally, Sanchez was arrested at the conclusion of the interrogation for sexual assault. This factor supports the conclusion that the interrogation was custodial. (See *Aguilera, supra*, 51 Cal.App.4th at p. 1162.)

We acknowledge that the length of the interrogation was approximately two hours, not including the time from when the deputies initially contacted Sanchez. However, there is no bright-line rule for the length of time that converts an interrogation from noncustodial to custodial. (Compare *Aguilera, supra,* 51 Cal.App.4th at p. 1165 [two-hour interrogation which was "intense, persistent, aggressive, confrontational, accusatory, and, at times, threatening and intimidating" was custodial], with *Green v. Superior Court* (1985) 40 Cal.3d 126, 131-132 [nearly two-hour interview at police station, which involved "detailed but not accusatory" questioning, was not custodial].) We therefore consider this factor neutral.

### 2. Factors Weighing Against Custodial Finding

As discussed further below, several factors weigh against a finding that the interrogation was custodial.

First, before the interrogation commenced, the deputies confirmed that Sanchez had come to the police station voluntarily. Further, Sanchez had been advised that he was not under arrest and the deputies advised him that "at any time if [Sanchez] need[ed] to, [he] can end this conversation." Whether the police informed the suspect that he or she was not under arrest, that he or she was free to terminate the interview at any time, and whether the person's conduct indicated an awareness of such an ability are all relevant factors weighing in favor of a noncustodial encounter. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

As the *Torres* court explained, these advisements are occasionally referred to as " ' "*Beheler*[5] admonitions." ' " These advisements do not, "standing alone, insulate an interrogation from *Miranda's* reach." (*Torres, supra*, 25 Cal.App.5th at p. 174.) Rather, the totality of the circumstances controls whether the interrogation was custodial. To this end, we observe additional factors support a finding that the interrogation was noncustodial.

Second, although the door to the interview room had been closed, deputies explained it was closed for privacy reasons. The door was not locked at any point during the interrogation. And, at no point during the interrogation was Sanchez handcuffed or was his freedom of movement physically restricted. The fact that there were no restrictions placed upon a suspect's freedom of movement during an interrogation supports a finding that the interrogation was noncustodial. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1162.)

Finally, the overall atmosphere of the interrogation was cordial and professional rather than intense and confrontational. Neither Lovan nor Ollague threatened Sanchez, made any promises of leniency, or repeatedly refused to accept his denials. Nor did they pepper him with "an unrelenting number of accusatory questions" (*Saldana, supra*, 19 Cal.App.5th at p. 457) or tell him that he could not go home until he told the truth (see *Torres*, *supra*, 25 Cal.App.5th at p. 179).

Although the deputies' goal was clearly to elicit a confession from Sanchez, we are persuaded that there is a substantive difference between the interrogation here, and those that occurred in *Saldana* and *Torres*. At no point, did detectives convey the message that Sanchez had no meaningful choice but to admit to the allegations or that he would be interrogated until he confessed. This factor, while not dipositive, is crucial. (*Aguilera*, *supra*, 51 Cal.App.4th at p. 1164 ["on the issue of custody, courts consider

---

[5]    *California v. Beheler* (1983) 463 U.S. 1121.

highly significant whether the questioning was brief, polite, and courteous or lengthy, aggressive, confrontational, threatening, intimidating, and accusatory"].)

Under the circumstances, we conclude the tenor and manner of questioning in the instant case is more closely analogous to *Potter, supra*, 66 Cal.App.5th at page 542. We acknowledge that the deputies expressed their belief that the victims were telling the truth, that they had evidence supporting the allegations of abuse perpetrated by Sanchez, and that at one point, Lovan called Sanchez a liar and raised his voice. However, on balance, the combined effect of these statements and the circumstances of the interrogation did not create a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest. (*Aguilera, supra*, 51 Cal.App.4th at p. 1162.) We therefore conclude Sanchez's statements and letters of apology were not admitted in violation of *Miranda*. A *Miranda* admonition was not required under the circumstances.

## IV.  Trial Counsel's Failure to File a Motion to Suppress Sanchez's Apology Letters

Sanchez further contends trial counsel was incompetent for failing to file a motion (§ 1538.5) to suppress his apology letters. The People respond that because this issue was not raised below, the facts necessary to resolve Sanchez's claims are lacking, and in any event, any motion to suppress filed by trial counsel would have been futile. We agree with the People.

### A.  Background

The facts underlying deputies' initial contact with Sanchez as well as the search of his home were discussed in the Statement of Facts. We therefore do not repeat them here.

### B.  Forfeiture/Ineffective Assistance of Counsel

The Sixth Amendment guarantees the " 'right to the effective assistance of counsel.' " (*Strickland v. Washington* (1984) 466 U.S. 668, 685-686 (*Strickland*).) To succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate

26.

that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Id.* at p. 694.)

With respect to the first prong of *Strickland*, a defendant "must show that counsel's representation fell below an objective standard of reasonableness" measured against "prevailing professional norms." (*Strickland*, *supra*, 466 U.S. at p. 688.) In evaluating counsel's actions, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Id.* at p. 689.) Thus, a defendant must overcome the presumption that the challenged action might be considered sound trial strategy under the circumstances. (*Ibid.*) "Reasonableness must be assessed through the likely perspective of counsel at the time." (*People v. Ochoa* (1998) 19 Cal.4th 353, 445.)

The second prong under *Strickland* requires a defendant to establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland, supra*, 466 U.S. at p. 694.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*) "How readily deficient performance undermines confidence in the trial's outcome will in part depend on the strength of the trial evidence on any decisive points. A 'verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.' " (*In re Gay* (2020) 8 Cal.5th 1059, 1087.)

## C. Analysis

Sanchez contends his confession and apology letters were the product of an illegal seizure, detention, and search. First, he challenges the patdown search conducted by Ollague, claiming it was unsupported by specific and articulable facts that Sanchez was armed and dangerous. Second, he contends he was unlawfully subjected to involuntary

detentions and investigatory seizures, including, his initial contact with Ollague, the search of his room, and his transportation to the police station in a locked patrol vehicle.

With respect to Sanchez's first clam, we find no error nor prejudice assuming error under *Strickland*. As the People observe, no evidence was obtained during Ollague's patdown search of Sanchez. Trial counsel was not ineffective for failing to make a futile motion. (*People v. Thompson* (2010) 49 Cal.4th 79, 122.)

As to Sanchez's second claim, the record fails to support the conclusion that he was subject to an involuntary detention and investigatory seizure. The record shows Sanchez agreed to be transported to his home to speak with detectives, he consented to allow detectives to search his residence, and he agreed to be transported to the police substation for further questioning. During each portion of the encounter, Sanchez was repeatedly advised that he was not under arrest, he was not placed in restraints, and deputies confirmed that his participation was voluntary.

Under the circumstances, it was objectively reasonable for trial counsel to challenge the admissibility of Sanchez's statements and letters under *Miranda*, rather than by seeking to suppress his statements under section 1538.5. We therefore conclude Sanchez has failed to prove trial counsel's election was not sound trial strategy under the circumstances. In light of our conclusion that Sanchez has failed to show trial counsel's actions were objectively unreasonable, we do not address the People's claim that Sanchez has failed to show prejudice.

## V. The Trial Court Did Not Abuse its Discretion While Investigating Potential Juror Misconduct

Sanchez argues the trial court's questioning of a juror about allegations of misconduct during deliberations was improper. According to Sanchez, the trial court's questioning of Juror No. 4 intruded upon the juror's deliberations and coerced a unanimous verdict. The People contend the trial court did precisely what it was required to do under the circumstances: investigate. And, because the court's line of questioning

stayed within appropriate bounds and it did not coerce a holdout juror to reach any particular verdict, the court did not commit prejudicial error. We agree with the People.

### A. Background

*April 4, 2018 – Morning session*

On the second full day of jury deliberations, the trial court informed the parties that Juror No. 3, the foreperson, had contacted the bailiff. Juror No. 3 reported that Juror No. 4 was not engaging in deliberations, and that Juror No. 4 had made it clear that he "ha[d] not left his bias outside." All of the other jurors had heard Juror No. 4 make a statement to this effect.

The court then spoke with Juror No. 10, who told the court that he had asked Juror No. 4 whether a past experience with law enforcement was affecting his decision-making process. Juror No. 4 replied, " 'Yeah, maybe.' "

Next, the court spoke with Juror No. 6, who informed the court that Juror No. 4 "seems to have some prejudices and doesn't seem like he's focusing on necessarily just the evidence." Juror No. 6 confirmed that Juror No. 4 had expressed his opinions to the entire jury panel.

Finally, the court then spoke with Juror No. 4. It asked Juror No. 4 whether he "had any problems with the case in terms of experiences [he'd] had." Juror No. 4 responded, "I don't feel I do." He further confirmed that he was focusing purely on the evidence presented at trial.

Juror No. 4 indicated that he understood the difference between using his common sense, which was permissible, versus judging the case in light of his own biases, which was prohibited. Juror No. 4 stated, "When I look at the evidence, I'm looking at all the evidence. I'm thinking about all the evidence; not just pieces of the evidence. [¶] … [¶] And when I look at that, I feel it's being as fair as I know how to be. It's just the way I feel." He felt that he was able to leave his biases at the door and focus on the evidence presented. Juror No. 4 was excused from the courtroom.

After Juror No. 4 exited the courtroom, the court heard argument from the parties. The court tentatively ruled that Juror No. 4 would remain on the jury. It brought Juror No. 4 back into the courtroom and instructed him as follows:

> "Sir, when we ask a juror like yourself and the other good people with you to go back, we don't ask you to waive your common sense in any manner, shape, or form. You have special skills in the job you do; other people have special skills in the job they do, and life experiences, in life, and there's a separation between life experiences you and other jurors have dealt with in life and the evidence you hear in the courtroom. What I mean by that, longwinded as it is, is you cannot discuss your life experiences in the jury room because that's not evidence, but your life experiences to you help you process the evidence. Do you see the difference?

> "In other words, there's twelve good people in that jury room. They're only talking about the evidence – or should be. But how they process that is based on who they are and what's happened to them in life. Okay? But they can't sit around talking about what's happened to them in life because that's not evidence. Do you see what I mean?"

Juror No. 4 confirmed that he had understood the court's instruction. Without requesting details, the trial court asked Juror No. 4 further questions to determine whether he was sharing personal stories in the jury room about his life experiences. Nothing Juror No. 4 shared with the court was deemed problematic.

The court asked Juror No. 4 whether he could resume deliberations and "leave everything at the door as was requested on day one and not let it interfere with the discussion as to the evidence presented in this trial." Juror No. 4 replied affirmatively. The court asked Juror No. 4 whether he would work with the other jurors. Juror No. 4 responded affirmatively again.

Thereafter, Juror No. 4 left the courtroom, and the court heard argument from the parties. After considering the arguments, the court ruled that Juror No. 4 would not be dismissed. After the court called the jury back, it admonished the jury as follows:

> "Ladies and gentlemen, things happen. It doesn't matter. We're moving on. I can't thank you enough. Again, you've been

30.

fantastic. You're deliberating hard. That's all we can ever ask of our jurors. Total appreciation from the Court, counsel, and the system. So thank you. And again, Kern County's just great people.

"With that, just a quick reminder as to evidence in this case. The only evidence you can consider is what you heard from the witness stand and anything else that you have received as exhibits. That's all you can consider in this case. Any biases, et cetera, that you may have had prior to any -- you must leave them at the door. Do you understand that? That's all we're required [*sic*] of jurors. And again, I can't thank you individually enough and collectively enough for the work you've put on this case given what we gave to you as a case. You see what I mean? So again, I can't thank you enough. I just wanted to remind you. We've been together quite a long time now, not me personally, but you as a group. Again, I can't thank you enough."

The court excused the jury to continue its deliberations.

That day, at 4:00 p.m., the foreperson sent a note to the court stating: "Hung jury – [¶] [Juror No. 4] says he 'believes the confession of F. Sanchez.' 'But can he convict? – 'No.' "

**April 5, 2018 – Morning session**

The following day, the court discussed the foreperson's note with the parties. After considering the parties' arguments, the court referred the jury back to CALCRIM No. 220 [Reasonable Doubt] as well as CALCRIM Nos. 3550 [Pre-Deliberation Instructions] and 3551 [Further Instruction About Deliberations].[6] Specifically, the court

---

[6]     The portion of CALCRIM No. 220 read to the jury was as follows:

"A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt [unless I specifically tell you otherwise].

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received

31.

referred the jury back to the portion of CALCRIM No. 220 that discussed the presumption of innocence and the People's burden of proof.

Ten minutes after the jury retired for further deliberations, the court received a note from the foreperson as follows: "One juror feels if a defendant takes the stand – and testifies as not-guilty – he is automatically not guilty and we cannot convict. The juror stated he feels this way about all trials. [¶] Need clarification. [¶] Thank you." The court invited the foreperson into the courtroom for clarification. The foreperson confirmed that Juror No. 4 had informed the rest of the panel that he could not convict in a situation where the defendant had taken the stand and testified that he was not guilty.

**April 5, 2018 – Afternoon Session**

That afternoon, at 1:33 p.m., the court spoke with Juror No. 4. The trial court read the foreperson's note to Juror No. 4, and asked Juror No. 4 for comment. Juror No. 4 disagreed with the foreperson's statement of his viewpoint, explaining that he was only trying to "look at all of the evidence." Juror No. 4 asked, "[W]hen [Sanchez] testified, that is evidence; is it not?" The trial court replied, "Absolutely." And Juror No. 4 stated, "So it has to be considered." The trial court replied, "Absolutely."

Juror No. 4 explained, "It does not automatically make him guilty or innocent, but I was just saying it should be looked at. That's all I'm saying." The court asked Juror No. 4 whether he was "following the law as to that witness" and keeping an open mind, and the juror replied that he had "tried to."

Juror No. 4 also agreed that it was his job "to assess the credibility of every witness and not automatically shut off witnesses because [he had] made a decision about one." He further explained that he had "tried to get others to look at this." He added, "Now, when I listened to a witness, any witness, … I look at it as, … this is evidence.

throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he's entitled to an acquittal, and you must find him not guilty."

Now, how am I going to get to is he guilty, or is he innocent?  And I think about things that were said during the interview, things that were said during the testimony, and any of the evidence that came up from other witnesses.  I tried to look at it all.  To me, the way I look at it, sir, I don't see beyond a doubt."

Juror No. 4 stated that following his prior conversation with the court, he had returned to the jury room and tried to work with the other jurors.  The court noted for the record that many of the juror's statements had "c[o]me out spontaneously."  The court then read the part of CALCRIM No. 226 regarding assessing the credibility of witnesses:

> "You alone must judge the credibility or believability of the witnesses.  In deciding whether testimony is true and accurate, use your common sense and experience.  You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have.  You may believe all, part, or none of any witness's testimony.  Consider the testimony of each witness and decide how much of it you believe."

The court asked Juror No. 4, "[c]an you follow that law?"  Juror No. 4 replied that he felt that he had "followed that law" and affirmed that he could follow that law.  The court excused Juror No. 4 from the courtroom.

Over defense objection, the court called in Juror Nos. 3 (the foreperson), 1, and 2 to find out what they were saying about Juror No. 4's ability to follow the law and to determine "if there's a public way he presents himself versus a private."  The court explained it was "seeing a pattern potentially."  The court was concerned about Juror No. 4's body language.  The court was also concerned about the foreperson's claim that if a defendant takes the stand and testifies that he or she is not guilty, that would *automatically* render the defendant not guilty.

Trial counsel moved for a mistrial on two grounds.  After further argument from the parties, the trial court denied counsel's motions.

33.

Juror No. 3 was called into the courtroom. The court simply asked whether Juror No. 4's comments were made when everyone was sitting at the table (in the deliberation room). Juror No. 3 replied affirmatively.

Once Juror Nos. 1 and 2 individually entered the courtroom, the court asked whether Juror No. 4 had expressed his feelings about particular witnesses while all of the jurors were seated at the table or whether any of them observed a juror who was not following the law. The jurors both replied that all jurors were following the law. The court was satisfied with the jurors' responses and sent the jury back to continue their deliberations.

At 2:11 p.m., the jury resumed their deliberations.

At 2:20 p.m., the foreperson sent a note to the court asking whether the jury should "move on" to counts 2 and 4 if it could not reach a verdict as to counts 1 and 3. The court referred the jury to CALCRIM No. 3515 and attached a written copy of the instruction to its response.

At 3:40 p.m., the foreperson sent a note stating that the jury had "reached a conclusion" on two counts but "hung" on two counts. The court reviewed the verdict forms and sent the jury back to the jury room to clarify its position regarding "page 6" of the verdict packet.

At 4:05 p.m., the jury sent another note to the court seeking clarification as to which count "page 6" applied. The court clarified that "[p]age 6 refer[red] to count 2."

At 4:16 p.m., the foreperson sent a note indicating that the jury had reached a verdict. The jury could not reach a verdict as to counts 1 and 3, and the court declared a mistrial as to those counts. But the jury found Sanchez guilty on counts 2 and 4 and found the multiple victim enhancement attached to each count to be true. The jury was polled, and each juror affirmed that the verdicts were their "own individual verdict."

## B.     Relevant Legal Principles

During a criminal trial, " '[t]he law is clear ... that the court must investigate reports of juror misconduct to determine whether cause exists to replace an offending juror with a substitute.' " (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 483.)  "[A] hearing is required only where the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case." (*People v. Ray* (1996) 13 Cal.4th 313, 343.)

A trial court may discharge a juror "if it appears as a 'demonstrable reality' that the juror is unable or unwilling to deliberate." (*People v. Cleveland* (2001) 25 Cal.4th 466, 484.)  However, "caution must be exercised in determining whether a juror has refused to deliberate." (*Id*. at p. 475.)  "[A] trial court's inquiry into possible grounds for discharge of a deliberating juror should be as limited in scope as possible, to avoid intruding unnecessarily upon the sanctity of the jury's deliberations.  The inquiry should focus upon the conduct of the jurors, rather than upon the content of the deliberations.  Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists. … permitting the attorneys for the parties to question deliberating jurors is fraught with peril and generally should not be permitted.  Of course, the court may allow counsel to suggest areas of inquiry or specific questions to be posed by the court." (*Id.* at p. 485.)

" 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.' " (*People v. Cleveland*, *supra*, 25 Cal.4th at p. 478.)

## C.     Analysis

We conclude the trial court acted within its discretion in investigating Juror No. 4's potential misconduct.  The foreperson advised the trial court that Juror No. 4 had

stated he had brought his bias into the deliberation room. When the court made further inquiries about the foreperson's concern, Juror No. 4 admitted that his prior experience with law enforcement may be affecting his decision about the evidence. Another juror expressed a similar concern as the foreperson, stating, Juror No. 4 "seems to have some prejudices and doesn't seem like he's focusing on necessarily just evidence."

The record leaves no doubt that the trial court's limited inquiry into the foreperson's concern was proper. The jury was instructed that it must "not let bias, sympathy, prejudice, or public opinion influence [its assessment of the evidence or its] decision." The jury was further instructed that "[e]vidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the court] told [the jury] to consider as evidence." The trial court made a limited inquiry into the jurors' concerns to ascertain whether Juror No. 4 was following the instructions given.

We further conclude that the trial court's investigation into the foreperson's second concern regarding Juror No. 4 was proper as well. According to the foreperson's second note, Juror No. 4 felt that if a defendant takes the stand and maintains his innocence, the defendant is *automatically* not guilty, the jury cannot convict, and Juror No. 4 felt this way about all trials. If the foreperson's allegations were proven true, this would constitute "good cause" to doubt Juror No. 4's ability to perform his duties and would justify his removal from the case.

"Once the court is alerted to the possibility that a juror cannot properly perform his duty ... it is obligated to make reasonable inquiry into the factual explanation for that possibility." (*People v. McNeal* (1979) 90 Cal.App.3d 830, 838.) We are persuaded the trial court here "intruded as minimally as possible to satisfy its dual goals of investigating allegations of misconduct while preserving the secrecy of the deliberative process." (*People v. Russell* (2010) 50 Cal.4th 1228, 1252.)

Sanchez further challenges the trial court's statement to Juror No. 4 that " '[y]ou're my representatives in there,' " and claims the trial court coerced Juror No. 4

into siding with the majority. As Sanchez's arguments are neither fully developed nor supported by the record, we summarily reject them. We conclude the trial court did not abuse its discretion by conducting a limited inquiry into whether Juror No. 4 was potentially biased or refusing to follow instructions.

## DISPOSITION

The sentence is reversed and the matter remanded for full resentencing. In all other respects, the judgment is affirmed.